# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re:<br>    MEGAN P. THOMAS<br>        *Debtor*<br>-------------------------------------------------<br>CHRISTOPHER W. SPAGNOLA<br>NATALIE SPAGNOLA<br>        *Movants/Purchasers*<br>v.<br>M&T BANK,<br>MEGAN P. THOMAS,<br>KERRY PAE AND KERRY PAE<br>AUCTIONEERS, et al.<br>        *Respondents* | Chapter 13<br><br>Case No. 1:15-bk-00825-RNO<br><br><br><br>Chief Judge Robert N. Opel II<br><br><br>11 U.S.C. § 363 |

### MOVANTS'/PURCHASERS' SURREPLY BRIEF IN RESPONSE TO BRIEFS OF M&T BANK AND OF DEBTOR AND AUCTIONEER

AND NOW, this 14th day of December, 2017, come the Movants and Purchasers, Christopher W. Spagnola and Natalie Spagnola, by and through counsel, the CGA Law Firm, P.C., and do file the within Surreply Brief in Response to the Briefs of M&T Bank and of Debtor and Auctioneer as follows:

### RELEVANT FACTUAL AND PROCEDURAL HISTORY

Purchasers incorporate the contents of their original Motion to Compel Sale, their Responses filed to the Respondents' Objections to the Motion, and their Brief in Support of the Motion to Compel Sale as if fully set forth herein.

On March 17, 2016, the Debtor filed an adversary proceeding in this matter, seeking this Court's approval to sell the real property, with improvements, located

{01398492/1} 1

at 3414 Trone Road, Glenville, Pennsylvania 17329 ( "***Property***"). By Order of the Court, dated June 7, 2016, the Debtor was authorized to offer the Property for sale through a traditional real estate sales listing with a broker. The Court's Order provided, further, that, if the Property was not sold through the brokerage listing after three (3) months, it would be exposed for sale at auction. Under and pursuant to the Court's June 7, 2016 Order, on the completion of a successful auction, Debtor was to present the purchase and sale agreement to the Court for approval.

From the date of the auction through the present, Debtor, with the aid and encouragement of M&T Bank, has failed and refused to honor her obligations under the Court's June 7, 2016 Order, and has failed and refused to present the Purchase and Sale Agreement to the Court for consideration and approval. Because of the Debtor's refusal (in collusion with M&T Bank in order to obtain a higher sale price) to present the Purchase and Sale Agreement to the Court for consideration and approval, it was necessary for Purchasers to put the Sale Agreement before the Court.

On November 10, 2017, Purchasers filed a Brief in Support of the Motion to Compel Sale of 3414 Trone Road. Debtor and Auctioneer filed their Reply Brief in Opposition of the Motion and on December 6, 2017, M&T Bank filed its Reply Brief in Opposition of the Motion. Both Briefs make essentially the same arguments so Purchasers file the within Surreply Brief in response to both.

{01398492/1}2

# ARGUMENT

## I. The Nature of the Auction

Essentially, in the United States, three basic types of auctions have been recognized by courts, those being (i) an absolute auction, (ii) an auction with reserve, and (iii) a conditional auction that is subject to seller confirmation. E.g., Young v. Hefton, 38 Kan. App. 2d 846 (2007). An absolute auction is one at which there are ***no reservations or limiting conditions imposed by the seller***. In an auction with reserve, the seller may establish a minimum price at which the seller is willing to sell the property, and the auctioneer has the right to withdraw the property at any time before the close of bidding. Id. As articulated by the Kansas Court of Appeals, "[t]he key distinction between an auction with reserve and a conditional auction is that property can only be withdrawn *before* the close of bidding in the former, but it can be withdrawn *after* the close of bidding in the latter." Id.; see also Cuba v. Hudson & Marshall, 213 Ga. App. 639, 640 (1994) ("[T]here is a distinction between auctions which are merely conducted with reserve and those in which the seller explicitly reserves the right to approve, confirm or reject the high bid."); Udall v. T.D. Escrow Services, Inc., 154 P.3d 882, 888 (Wash. 2007).

The nature of the auction is ultimately dependent on how it is advertised to the public. Udall, 154 P.3d at 888. In this case, by advertising the auction to the

public as an "ABSOLUTE AUCTION," the Debtor and her agent, Kerry Pae, gave notice to the entire world, including Purchasers, that there would be no reservations or limiting conditions imposed by the seller (*i.e.,* the Debtor) at the auction. As such, even accepting, *arguendo*, the dubious claims that the auctioneer announced, at the commencement of the auction, that the sale was "subject to Bankruptcy Court approval," does not create a reservation exercisable by the Debtor – which reservation, as a matter of law and industry practice, would necessarily have to be exercised prior to the fall of the hammer. See Cuba, 213 Ga. App. At 639-40 ("[T]he seller must exercise [her] right to withdraw the property from sale before the auctioneer accepts the high bid by letting his hammer fall . . . .") Nor, did the purported announcement that the sale may be subject to Bankruptcy Court approval afford the Debtor and M&T Bank license to reject the purchase price after the fall of the hammer (characteristic of a conditional auction subject to seller, or lender, confirmation).

Effectively, both the Debtor and M&T are arguing not only that the auction was not an "ABSOLUTE AUCTION," as advertised, but that – beyond being a reserve auction – it was an auction subject to seller confirmation (and the bank's confirmation, as well). The difficulty with this argument, however, is that the courts have made it clear that in order for the seller (or, arguably, the lender) to possess and exercise the right to reject a sale after the fall of the hammer, that right

{01398492/1}4

must be advertised before the commencement of the auction. Specifically, the Udall court held that "[o]nly by express reservation announced prior to the sale can the seller reserve the right to review and reject bids after the auctioneer closes the sale." Udall, 159 Wn. At 912, 154 P.3d at 888 (citing Cont'l Can Co. v. Commercial Waterway Dist. No. 1, 56 Wash.2d 456, 458-60 (1959)).

Even if it was announced that the sale was subject to Bankruptcy Court approval, which is denied, such announcement does not afford either the Debtor or M&T Bank the option of rejecting the high bid after the fall of the hammer or to refuse to present the Purchase and Sale Agreement to the Court as required by the Court's June 7, 2016 Order. As such, the argument by Debtor and M&T Bank, that the purported November 3, 2016 correspondence between Debtor's counsel and Kerry Pae rendered the auction an auction with reserve, is not compelling. In this regard, further guidance can be found in Udall.

The auction in Udall was a reserve auction in which the reserve was disclosed to the public. Apparently, in Udall, the lender/seller informed the auctioneer, prior to the auction, that the minimum acceptable bid for the property was $159,421.20. However, the auctioneer announced the minimum bid as $59,421.20. Thereafter, the auctioneer accepted a high bid in the amount of $59,422.20. Because the auctioneer accepted a high bid that was $100,000.00 less that the amount required by the lender/seller (as between the lender/seller and the

auctioneer, but not disclosed to the public), the lender/seller refused to deliver a deed for the property. On review, the Washington Supreme Court held that the lender/seller did not have the right to convert a reserve auction into an auction subject to seller confirmation after the fall of the hammer. Udall, 154 P.3d at 888.

Fundamentally, but more egregiously, the Debtor and M&T Bank are attempting to accomplish a similar, and equally improper, after-the-fact conversion here. In the instant case, neither the Debtor nor M&T Bank had the right to impose any reservation or limiting conditions prior to the fall of the hammer. And, certainly, neither the Debtor nor M&T Bank had the right to reject the high bid recognized, and accepted, with the fall of the hammer.

Simply put, the objecting parties cannot change the rules after the conclusion of the auction; nor, can they usurp the power of the Court to review and approve the sale.

## II. Response to Statements Regarding Value of the Property

Notwithstanding the fact that the evidentiary record in this matter was closed at the September 7, 2017 hearing before the Court, the objecting parties urge that the purchase price/highest bid is inadequate[1]. More particularly, the objecting parties improperly make reference to property valuation in their Briefs. Not only should such suggestions be stricken and disregarded, but they are inconsistent with

---

[1] However, the Brief filed by Debtor and Auctioneer on December 4, 2017, page 6, explicitly states: "Because of the deterioration of the property, however, the Trone Road Property is believed now to be worthless."

{01398492/1}6

the testimony of Kerry Pae. In their brief, the Debtor and Auctioneer stress the skills, qualifications, and expertise of Kerry Pae as an auctioneer who has been qualified as an expert before this Court. Significantly, Kerry Pae testified that at an auction – such as the auction at issue in this case – fair market value is determined by the fall of the hammer. His testimony also established that his website advertises that fair market value is determined by the fall of the hammer. This conclusion is also supported by Pennsylvania law. Specifically, in <u>Bank of Landisburg v. Burruss</u>, 362 Pa. Super. 317, 524 A.2d 896 (1987), the Superior Court of Pennsylvania held that the fall of the hammer determines the fair market value of property sold at auction.

Given the foregoing, and recognizing the deterioration and waste to the Property, the only conclusion to be reached in this case is that Purchasers' $255,000.00 high bid is adequate, and, is – both in fact and as a matter of law – reflective of the fair market value of the Property. The only evidence presented regarding the value of the Property is the evidence of the highest bid received at the Auction. Neither the Debtor nor the Auctioneer nor M&T Bank presented any contrary evidence of value at all, and the evidentiary record is now closed. The objecting parties cannot, now, supplement the evidentiary record with new claims in their Briefs once the record has been closed.

It is in the best interest of all parties, as well as the Court in order to uphold the integrity and finality of the judicial sale process, to sell the property to the Purchasers for their highest bid of $255,000.00, as the highest bid, after competitive bidding among several bidders, represents the most accurate value and none of the parties has produced evidence to the contrary of a higher bidder or any higher offer for the purchase of the Property.

III. **Response to Statements Made Regarding the Testimony of Kerry Pae and Ryan Groff**

The objecting parties all argue that Kerry Pae's and Ryan Groff's testimonies at the September 7, 2017 evidentiary hearing were credible and that both auctioneers are disinterested parties. Page 6 of Debtor's and Auctioneer's Brief explicitly claims that, ". . . the only manner in which Mr. Pae can be compensated is if the sale were to occur." That is simply not a true statement.

Provision 5 of the "Absolute Real Estate Contract" entered into between the Debtor and the Auctioneer, Exhibit "A" to Purchaser's Response to M&T Bank's Objection to Motion to Compel Sale, states that:

> Seller agrees that if Seller withdraws the property or properties from sale . . . Seller will pay Auction Co. Five Thousand Dollars ($5000.00) DOLLARS [sic] per property for services rendered, in lieu of Auction Co.'s regular commission, plus the cost of advertising and surveys, if any.

Provision 4 of the Absolute Real Estate Contract, states that the cost of advertising is thirty-five hundred ($3,500.00) dollars. Therefore, according to his contract,

{01398492/1} 8

Case 1:15-bk-00825-RNO    Doc 133    Filed 12/14/17    Entered 12/14/17 18:35:00    Desc
Main Document    Page 8 of 20

whether the auction was successful or not, Kerry Pae would receive compensation. At best, he could receive a seven thousand six hundred fifty ($7,650.00) dollar commission from the successful Auction[2] sale to the Spagnolas (3% of $255,000.00), so the difference from earned commission of $7,650.00 from this successful sale, versus the $5,000.00 guaranteed fee, is minimal.

Kerry Pae really only had an interest in advertising and conducting the sale according to the contract to sell the Property Absolute, "without limit, favor, or reserve," since he would be compensated for doing so despite the results of the Auction. His fees were already earned at the conclusion of the auction.

Kerry Pae also has an interest in protecting his reputation from claims that his auction was improperly conducted. Page 10 of the Debtor's and Auctioneer's Brief states:

> "It should be noted that Mr. Pae conducts auctions for many trustees both in this Court and in other Courts, and has been certified as an expert witness in this Honorable Court, including particularly by Judge France as to the value of property and the conduct of auctions."

Therefore, Kerry Pae has both monetary and professional interests in the outcome.

As for Ryan Groff's interest in the outcome of the within proceedings, he is a young auctioneer in a competitive field where Kerry Pae has taken him under his

---

[2] Because the auction was concluded with a signed Purchase and Sale Agreement, the auction was, by definition "successful." Because the auction was "successful," the Debtor was obligation – in accordance with the terms of the Court's June 7, 2016 Order – to present the Purchase and Sale Agreement to the Court for consideration and approval.

{01398492/1}9

Case 1:15-bk-00825-RNO    Doc 133    Filed 12/14/17    Entered 12/14/17 18:35:00    Desc
Main Document    Page 9 of 20

wing and given him business. Of course he has an interest in protecting the reputations of Kerry Pae and himself, as they associate with each other professionally. It also seems fair to assume that Ryan Groff was being paid for his services related to the auction at issue.

Purchasers, however, are the only parties to produce a disinterested witness. The witness was a bidder, Willmont "Bill" Adams ("*Bill*") who was present on the day of the auction, who witnessed the announcements reiterating the absolute nature of the auction, and who had no interest whatsoever in the disposition of the property after his bid failed. Bill was gracious enough to take time to travel to Harrisburg and testify as to what actually happened that day to ensure justice could be reached in this matter. Page 10 of the Debtor's and Auctioneer's Brief stated that because Bill approached Mr. Spagnola about performing work on the property he had an economic interest in the disposition of the property. As both Bill and Mr. Spagnola testified, this is simply the reason why Bill contacted Mr. Spagnola regarding his concern of winterizing the property. He was not sure if the Purchasers were aware of the Property's heated floors (which are assumed to be ruined at this point, over a year later) and a discussion was had during that conversation about Bill's willingness to testify if the time came. In fact, contact information was exchanged between Mr. Spagnola and Bill initially following the

{01398492/1} 10

Auction, after Kerry Pae changed the contract terms and first notified the Purchasers that the sale was subject to further Court approval.

The Debtor's and Auctioneer's Brief, page 7, states that: "Mr. Spagnola's testimony was clear that he knew that Bankruptcy Court approval was necessary." Purchasers do not argue that point[3]. In fact, that is the entire point of the filing of the within Motion by the Purchasers – to obtain the Bankruptcy Court approval that was never sought by the Debtor. Debtor and Auctioneer claim in their Brief that Kerry Pae and Ryan Groff "independently testified as to the same facts – that M&T Bank would have to be paid in full . . ." This is a gross misrepresentation of their testimonies. Kerry Pae and Ryan Groff both actually testified that the sale would "be submitted to the Bankruptcy Court," *not* that M&T Bank would have to be paid in full. The sale, however, was never submitted to the Bankruptcy Court. Had the Purchasers themselves not submitted the results of the Auction via the within § 363 Motion, the Bankruptcy Court, which had already approved the Auction and ordered the results of the Auction to be submitted by Motion, would never even have known that the Auction occurred.

**Purchasers relied on the promise, and on the contractual provision added after the fact, that the licensed professionals in charge of the sale would be seeking Court Approval and it would only be forty-five (45) days.**

---

[3] Aside from the fact that Purchasers did not know that Bankruptcy Court approval was needed until after the contract was executed and the $25,000 down payment check was delivered.

{01398492/1} 11

**Regardless of when the terms in paragraph 6A appeared on the contract, it is uncontested that the Court approval was never sought.** The contract was breached and Purchasers, over a year later, are still waiting for that Court approval.

Debtor and Auctioneer argue that "[b]ecause the lender is not being paid in full and will not consent to the sale, the Court **_cannot_** enter an Order approving the sale." First, this is the bank's argument to make, and not the Debtor's or Auctioneer's. Second, this statement completely undermines the discretion and power given to the Bankruptcy Court by Congress to approve such sales.

In their Brief in Support of the Motion to Compel Sale, Purchasers provided and disclosed to the Court a vast amount of law in support of Court Approval of this sale at the highest bid, and in support of the Court's ability to approve such sale despite the respondents' objections. That law provided by Purchasers includes governing statutes as well as case law all ordering the sale approved under these same circumstances, in this jurisdiction as well as several other jurisdictions. To date, none of the objecting parties have provided law to the contrary.

IV. **Response to Statements Made Regarding the Advertisements Circulated and Signs Displayed Rendering this an Absolute Auction**

M&T Bank's Brief, page 4, argues that "Mr. Pae also testified that advertisements and signs containing 'absolute auction' language were prepared prior to his receiving correspondence from Debtor's counsel. . ." However, all of the witnesses, including Kerry Pae and his associate, Ryan Groff, testified that the

advertisements and signs remained in circulation and on display on the Property through the conclusion of the auction of the Property held on November 12, 2016.

In fact, evidence was produced by Debtor's and Auctioneer's Counsel that he sent a letter to Kerry Pae stating that the bank would accept no less than $400,000.00. This begs the questions – why would Kerry Pae have concluded the auction at a bid of only $255,000.00 if he knew of an alleged $400,000.00 reserve? Why would he accept less than the alleged reserve if he testified to taking great care to announce a change in the terms of the auction prior to the bidding? Why would he have let the hammer fall on an amount less than the alleged reserve? And why would he accept a 10% down payment from Purchasers on a price he allegedly knew was insufficient? The answers to those questions remain a mystery, with the only possible reasons being that Kerry Pae either did not have notice of any reserve *or* he knew he had not properly announced a reserve prior to the bidding and was unable to change the terms of the sale during the bidding.

By leaving the advertisements in circulation and the signs displayed conspicuously on the Property, by describing the benefits of an Absolute Auction prior to the start of the bidding, by reiterating that there were no liens or encumbrances on the property, and by letting the hammer fall on the highest bid, it was in fact an Absolute Auction with no reserve.

Page 9 of the Brief states that "The Debtor essentially determined to withdraw the sale motion, which debtors are permitted to do." That is also not true. In an auction without reserve, after the auctioneer calls for bids on an article or lot, that article or lot cannot be withdrawn unless no bid is made within a reasonable time. 13 Pa. C.S.A. § 2328. Even in the Court finds that this was an auction with reserve, in an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale. <u>Id</u>. In either case, with or without reserve, the Debtor was obligated to file the Motion for Sale as it was too late to withdraw the Property from sale without a Court Order disposing of the Motion for Sale.

Debtor claims that only the Debtor can move to sell the Property. Debtor did so in the adversary proceeding, and even went further to enjoin her ex-husband from interfering with the sale. Debtor has already sought and obtained Court approval to sell the Property. The within Motion is simply to report the results of the Auction to the Bankruptcy Court as required.

At the evidentiary hearing held on September 7, 2017, Honorable Chief Judge Opel expressed his concern about what appears to be collusion between the objecting parties. In light of the conduct and financial interests of the Auctioneer, coupled with Debtor's refusal to file the required § 363 Motion or seek Court Approval as required by the Court Orders and the Agreement, in addition to

{01398492/1} 14

Debtor's Counsel's monetary interest in a higher bid, there is certainly evidence of collusion.

V. **Response to Statements Made Regarding Damages of Purchasers, Including Counsel Fees**

The Brief of Auctioneer and Debtor, pages 9 and 10, points out that "[t]he Movant's [sic] motion was filed in June, 2017, approximately eight (8) months later."

As Mr. Spagnola testified, the Purchasers' current counsel is the fourth (4th) attorney they hired. The first attorney was hired by the Spagnolas in the weeks following the sale. The Purchasers had contacted Kerry Pae who said he knew nothing about the status of the court approval, so the Purchasers hired their first attorney to seek the status. That attorney contacted both Debtor's Counsel and the former Counsel for M&T Bank, Attorney Puleo, who both told the attorney that *the bank* (and not the Court) would not approve the sale of the Property for less than $400,000.00.[4]

After no Court Approval was forthcoming, the Purchasers hired another attorney who did not know how to proceed to obtain an answer as to the disposition of the property. He wrote a letter to Debtor's Counsel and was also told the bank would decline to approve the sale.

---

[4] All parties have conceded that it is within the discretion and jurisdiction of the Bankruptcy Court(and not the bank) to approve the sale.

Purchasers then met with Attorney George Michak, a specialist in Auction Law, and soon thereafter, met with current counsel, Haley Rohrbaugh, on June 2, 2017, who immediately sought cooperation from Debtor's Counsel to file the Motion. When he declined to file the Motion, the Purchasers immediately filed the within § 363 Motion to Compel the Sale of the Property. The Purchasers have been pursuing the Court Approval of this sale diligently, and without delay, when it is and has been the Debtor's responsibility to do so all along.

**VI.    Response to Statements Made Regarding Language of Court Orders**

M&T Bank quotes the language of the June 7, 2016 Order approving the sale and then goes on to say that, "[i]n their Brief, the Spagnolas make no attempt to reconcile their motion to sell with the aforesaid requirements in the court's order." In making this allegation, M&T Bank ignores the entire first subargument on the Purchasers' Brief, as well as the Response filed by the Purchasers on August 25, 2017 to the Objection of M&T Bank to the within Motion, as well as the arguments made in open court on September 7, 2017. Throughout the pleadings and hearings, Purchasers and counsel have fully addressed the language of all of the Courts Orders in this case, but will briefly reiterate the effect of the language of the various court orders herein.

The Amended Order speaks for itself, and nowhere in the Order does it say any sale of Real Property "must" result in payment in full of M&T Bank's secured

claim. The Amended Order simply specifies that *this particular Order* does not automatically approve an amount less than the Bank's claim as to comply with the provisions set forth in 11 U.S.C. § 363. The language "[n]othing contained herein . . ." refers to that particular June 7, 2016 Order only. The Court had the ability to state clearly that M&T Bank must be paid in full on account of the loan secured by its first priority lien on Trone Road; however, it chose not to do so. Read with paragraph 23(e) and 24 of the same Order, the Court retained jurisdiction as follows:

> "(a) to enforce and implement the terms and provisions of the Auction Sale and each of the agreements, instruments, and documents executed in connection therewith; (b) to enforce this Order and to bar the enforcement of any liens and claims or other liabilities, except as otherwise assumed, against Purchaser or the Property; **(c) to compel delivery of the Property to any purchaser; (d) to resolve any disputes arising under or related to the Auction Sale; and (e) to interpret, implement, and enforce the provisions of this Order.**"

Because the Debtor failed to bring the results of the Auction back to the Court for approval as required, Purchasers have suffered damages in the form of Attorneys' fees and expenses and significant depreciation to the property as the Purchasers have been the only parties to actually visit and care for the property, having removed dead animals, cleaned the property, and winterized it at their own expense. The Purchasers are both business owners themselves, and have taken time out of their businesses to meet with counsel, attend hearings, and visit the property

to ensure its upkeep. M&T Bank and the Debtor, on the other hand, let the property sit, vacant, to deteriorate.

The law of the case is clear - the confirmed Plan modifies M&T Bank's secured claim to be paid "up to" the full amount[5] and the Court approved the sale, upon the Debtor's own request, pursuant to the Auctioneer's Absolute Auction contract, and without objection from M&T Bank.

## VII. Response to Statements Made that the within Motion should have been brought as an Adversary Proceeding

Purchasers have already addressed this argument numerous times. This Honorable Court has allowed the Motion to proceed with an evidentiary hearing and briefing schedule, so this argument is moot. By way of further response, Purchasers incorporate Paragraph 20 of their Response filed on August 25, 2017, to the Objection by Debtor and Auctioneer. Movants are parties in interest due to the Agreement entered into for the sale of the Property. The co-owner's interest, and any further injunctive relief, has been declared unnecessary. Debtor's and Auctioneer's own Brief acknowledges that the Court has already disposed of the need for an adversary proceeding, when stating:

> The Honorable Mary France held an emergency hearing on the Preliminary Injunction Motion and granted the Injunction, ordering that the Trone Road

---

[5] This language is referenced twice in the Brief of M&T Bank. Debtor drafted the Plan and included the specific provision that M&T Bank would be paid "up to" the amount of its claim and any portion of the claim remaining would be rendered unsecured and not a lien on the Property. The words "up to" are not ambiguous – there can be no argument made that M&T Bank and/or the Debtor failed to understand what the words "up to" meant.

{01398492/1}18

Case 1:15-bk-00825-RNO    Doc 133    Filed 12/14/17    Entered 12/14/17 18:35:00    Desc
Main Document    Page 18 of 20

Property be sold. Because this Order essentially disposed of the matter by ordering the Trone Road Property be sold, Judge France indicated that a final injunction hearing was not necessary.

Page 3, Doc 130, Brief in Opposition of Motion to Compel Sale.

Considering the requirements of the Code as well as this Court's Orders that the Debtor will file § 363 Motion once the property is sold, the filing of the within Motion by Parties in Interest, when the Debtor refused to file the Motion herself, is appropriate.

**VIII. <u>Response to Statements Made Regarding the Color of Pens used to Execute the Agreement</u>**

The argument regarding the color of the pens is reaching; however, it should be addressed. Mr. Spagnola testified that Kerry Pae had a variety of pens on his table, as well as pens in his pocket, one of which he used, and the Purchasers used the pen from Mrs. Spagnola's checkbook, having just paid the 10% down payment. Mr. Spagnola also testified that after the Agreement was executed and the down payment check was handed to the Auctioneer, and after the Purchasers asked the Auctioneer what the next steps would be, Kerry Pae slid the pink carbon copy of the Agreement back under the original to add in Paragraph 6A[6].

---

[6] Paragraph 6A is totally unrelated to Paragraph 6, which is dealing with personalty and fixtures included with the sale.

Regardless, the color of pen ink is not the crux of this matter, because if the sale being subject to Court Approval was a limiting condition of the contract, that Court Approval was never sought and the contract breached.

## CONCLUSION

For the reasons set forth above, the Purchasers respectfully request this Honorable Court to enter an Order (i) approving the sale upon the terms and conditions noted herein; (ii) ordering Attorneys' Fees and expenses incurred by the Purchasers be paid by M&T Bank, Debtor, and/or the Auctioneer; and (iii) grant the Purchasers such other and further relief as the Court deems just and proper.

Respectfully submitted,

**CGA LAW FIRM, P.C.**

<u>/s/ E. Haley Rohrbaugh, Esquire</u>
E. Haley Rohrbaugh, Esquire
Supreme Ct. I.D. No. 323803
Lawrence V. Young, Esquire
Supreme Ct. I.D. No. 21009
135 North George Street, York, PA 17401
*Counsel for Movants/Purchasers*

{01398492/1}20

Case 1:15-bk-00825-RNO    Doc 133    Filed 12/14/17    Entered 12/14/17 18:35:00    Desc
Main Document    Page 20 of 20